**AMERICAN ALOE CORPORATION,**
Plaintiff,

v.

**ALOE CREME LABORATORIES, INC.,**
Defendant.

Civ. A. No. 65 C 873.

United States District Court
N. D. Illinois, E. D.

Sept. 26, 1968.

Donald Flynn, James G. Barnes and David R. MacDonald, Baker, McKenzie & Hightower, Chicago, Ill., for plaintiff.

Charles J. O'Laughlin, Raymond, Mayer, Jenner & Block, James R. McKnight, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PERRY, District Judge.

The Court having examined the pleadings, and heard the testimony, and studied the exhibits, and briefs of the parties, filed by counsel, makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff, American Aloe Corporation, is a Delaware corporation, having its principal place of business in Chicago, where the complaint herein was filed on June 1, 1965 (Par. 1 of the complaint).

2. Plaintiff was incorporated on January 20, 1964, by Mr. White, but was inactive until Mr. White hired Mr. Goodman in September, 1964 (R–2293, 2301, 2332).

3. On February 8, 1966, Organon, Inc. acquired control of the stock of plaintiff and moved its office to West Orange, New Jersey (R–471, 1815, 573, 1929, 2215).

4. Defendant, Aloe Creme Laboratories, Inc., is a Florida corporation, incorporated on February 3, 1953, with its principal place of business in Fort Lauderdale, Florida (R–559, 1747, 1165; Par. 1 of the Complaint, Answer and Reply), and with an office and warehouse in Chicago, Illinois (R–1024, 2075).

5. In 1953, defendant began the creation and sale of ointment and in 1957, cosmetics, and became a modern pioneer in the stabilization of aloe vera gel in

these products (R–1163–5, 1190, 147, 1219, 1544, 1144–55, 1265).

6. Prior to defendant's incorporation in 1953, there is evidence that leaves of the aloe plant were cut and the fresh gel of the leaves was applied by users direct to their wounds, but the gel being vegetable matter, · decayed quickly and could not be stored for any length of time (R–1149–67).

7. There were sporadic attempts to maintain the fresh gel in an ointment, such as Dr. Collins, Alvagel and Mr. McCarty, but none of these stabilized the product for sufficient shelf life to establish a successful business (R–1178). Dr. Collins' product introduced in evidence as Plaintiff's Exhibit 55 had deteriorated and was black and unuseable (R–342, 1180–87). Mrs. Collins testified her business was very small (R–347–54). Alvagel had a very limited shelf life, and its business, if alive is insignificant (R–339). Mr. McCarty, with no knowledge of chemistry (R–982), was never successful with his products and admitted that he really went out of business when he moved to Dial, Georgia, in 1949 (R–976, 1005–7, 674). The formula he sold to Mr. White was never used by American Aloe Corporation, because Mr. White said he decided not to use it (R–674–6). There was no successful, accepted, stabilized ointment containing aloe vera gel prior to defendant entering the market in 1953 (R–1172).

8. Defendant became the first successful operation in creating and selling stable products containing aloe vera gel that had a commercially acceptable shelf life of two years (R–1164, 1172, 574, 2292, 1855).

9. In 1953, defendant was the first user of the trade name Aloe Creme Laboratories, Inc (R–1165), which use has been continuous to date and has never been restrained (R–1165–7, 1747; Def. Ex. 113).

10. Plaintiff, in its complaint—paragraph 5, admits defendant's trademark use of ALO- by stating "Defendant identifies its 'aloe products' by means of the word 'ALO' and combinations thereof."

11. Defendant's first product, an ointment, in 1953, was put out under the trademark ALO-CREME OINTMENT, abbreviated in 1963 to ALO-OINTMENT (R–1165–7, 560, 1049, 1244, 1216–8, 1534, 1191, 1544, 559–60).

12. Defendant's first cosmetics were introduced in 1957, under the trademarks ALO-CREME FACE, ALO-CREME HANDS, and ALO-CREME BODY, abbreviated in 1963 to ALO-FACE, ALO-HANDS and ALO-BODY (R–1167, 1216–21, 1405, 147, 1268, 1233, 1049, 1343, 1192; Def. Exs. 1–19 Group Ex. D–12, J–1, 3 and 6).

13. Defendant has used on its products, since at least 1963, the trademarks ALO-PLUS, TRAV-ALO, ALO-RELIEF, ALO- and Design, ALO-MOISTURE PLUS, ALO-V SKIN CLEANSER, ALO-BEAUTY MATTE, ALO-TONE, ALO-ROUGE, ALO-LIPSTICK, ALO-POUDRE, ALO-V SHAMPOO, ALO-COSMETICS, ALO-CABANA SET, ALO-LEGS, Design of Plant, QUEEN NEFERTITI, FASHION TAN and AFTER TAN (R–1192–8, 1214–21, 1343).

14. Plaintiff in its complaint—paragraph 5, admits defendant's ownership of the trademarks and registrations No. 784,193 for ALO-FACE and No. 784,194 for ALO-PLUS issued by the United States Patent Office to defendant (Def. Ex. 56, 60; R–1214).

15. Defendant is the owner of the following trademarks and registrations therefor issued to it by the United States Patent Office: No. 775,943 for TRAV-ALO, No. 789,240 for Design of Plant, No. 784,195 for AFTER TAN, and No. 659,620 for FASHION TAN (Def. Exs. 61, 64, 68, 67; R–1214, 1343).

16. Defendant is the owner of the following trademarks and registrations therefor issued to it by the United States Patent Office: No. 812,766 for ALO-HANDS, No. 815,248 for ALO-COSMETICS, No. 825,909 for ALO-RELIEF, No. 804,536 for ALO- and Design, No. 798,737 for QUEEN

NEFERTITI, No. 811,159 for Design of Plant, and No. 794,900 for MOISTURE PLUS (Def. Exs. 57, 58, 59, 62, 63, 65, 66; R–1214-5, 1343).

17. Defendant is the owner of a family of ALO- trademarks, including ALO-TONE, ALO-BEAUTY MATTE, ALO-OINTMENT, ALO-MOISTURE PLUS, ALO-V SKIN CLEANSER, ALO-V SHAMPOO, ALO-LIPSTICK, ALO-POUDRE, ALO-ROUGE, ALO-CABANA SET, ALO-LEGS (R–1192–8, 1343; Def. Exs. 9–45, Def. Group Exs. A, B, C, D).

18. Although plaintiff was incorporated on January 20, 1964, (R–2300, 2331), and claimed to have made token sales in December, 1964 (R–2213, 2240), it first introduced its products bearing trademarks in a store on March 8, 1965 (R–2293, 2317, 678). All of these dates are later than defendant's use of its aforesaid trademarks in 1953, 1957 and 1963, so that defendant clearly has priority on trademark use.

19. Defendant began using its first ALO- trademarks in 1953, and from that time to date, has continuously used ALO- trademarks on its products so that its use of same has exceeded 15 years in length of time (R–1165, 1191, 147, 1219).

20. When defendant began the use of its first ALO- trademark on ointment in 1953, and on cosmetics in 1957, there were no other or prior users of an ALO-trademark, so that defendant became the original and exclusive user of said ALO-trademarks (R–1164, 1172).

21. Defendant has extensively sold and advertised cosmetics and ointments bearing ALO- trademarks throughout the United States in leading department and drug stores from coast to coast (R–1199–1200, 59, 1749, 1228–42), with repeat orders (R–1751, 2145, 1255, 1261 to the extent of eight million dollars in sales and two million dollars in advertising (R–1228–46, 1749, 560, 1305–13).

22. The trade, including dealers in stores, the purchasing public and consumers have come to recognize cosmetics and ointments sold under ALO- trademarks as indicating exclusively the products of defendant and that ALO- to them means only the products of Aloe Creme Laboratories, Inc. (R–1938–46, 1785–8, 1793–6, 1798–1807, 1890, 1898, 2016–21, 2253–5, 2263, 2372–88, 41, 53, 1544, 1554, 1090–1108, 1111, 1590, 2318, 1273–89, 1255–9; Def.Group Ex. A–1, 22, 13, 18, 19, 20, B–9, 28, 35, C–6, 8, 1, 18, 3, M and K).

23. News media and other independent sources have acknowledged the success story of Aloe Creme Laboratories, Inc. and have written up news items recognizing that products bearing its ALO- trademarks indicate that they could only come from defendant. (Def. Group Ex. I–1, 2, 4, 7, 19, 27, 28, 29, 32, D–7, 8; Pl.Ex. 7; R–77–79, 176, 1245–6, 1267–72, 1493–4, 1313; Def.Ex. J–4, 21, 25, 30).

24. Competitors have respected defendant's ALO- trademarks and have acquiesced in defendant's exclusive ownership thereto, and a U. S. District Court has approved of a consent decree thereon (R–178, 118, 101–6; Pl.Exs. 12–14).

25. The U. S. Trademark Trial and Appeal Board has ruled in favor of defendant's ALO-MOISTURE PLUS, ALO-BEAUTY MATTE, ALO-V SHAMPOO, ALO-FACE, ALO-HANDS, ALO-BODY and ALO-LEGS trademarks in a final decision in its favor against another competitor (R–1405–6; Def.Ex. 114).

26. Due to defendant's origination, long, exclusive and extensive use of its family of ALO- trademarks including ALO-FACE, ALO-HANDS, ALO-BODY, ALO-LEGS, ALO-MOISTURE PLUS, ALO-BEAUTY MATTE, ALO-PLUS, ALO-OINTMENT, ALO-COSMETICS, ALO-RELIEF, ALO-ROUGE, ALO-POUDRE, ALO-LIPSTICK, ALO-V SHAMPOO, ALO-V CLEANSER, TRAV-ALO, Design of Plant, and ALO-TONE on its cosmetics and ointments, said trademarks have come to indicate defendant as the exclusive producer and source of said products, rather than the products themselves (R–1943, 1793,

1801, 1893, 2021, 2253, 2255, 2263, 1590, 2388, 41, 1554).

27. Plaintiff did not use HOUSE OF ALOE, ALOE ESSENCE, the Design of Plant, JEL D'ALOE, MASQUE OF ALOE or TROPICALOE as descriptive words as in small type in descriptive matter on its labels, but used them in capital letters on the fronts of jars, bottles and containers as trademarks and catchwords to attract the eyes and ears of prospective purchasers (R–2319, 2153, 53). Plaintiff's argument that it used its said trademarks only in a descriptive sense (R–2152–8) is not established by the evidence.

28. HOUSE OF ALOE, ALOE ESSENCE, the Design of Plant, JEL D'-ALOE, MASQUE OF ALOE and TROPICALOE were all used as trademarks on cosmetics and so advertised by plaintiff in 1965 at dates later than defendant's use of its said ALO- trademarks on its products (R–2293, 2317, 678, 2300, 2331, 2054–72; Def.Ex. 74, 75).

29. The evidence shows that plaintiff recognized HOUSE OF ALOE, Design of Plant and ALOE ESSENCE as trademarks, because plaintiff filed applications for trademark registration in the United States Patent Office of HOUSE OF ALOE with Design of Plant, and ALOE ESSENCE (R–2159–68, 2300; Def.Ex. 149, 150 and 3). But there is no evidence that registrations have ever been granted thereon.

30. Mr. Goodman testified that he knew of defendant's ALO- trademarks and design of plant before he selected the trademarks HOUSE OF ALOE, Design of Plant and ALOE ESSENCE for plaintiff (R–2141–68, 2297). Mr. Goodman further testified that he had thought up ALOE ESSENCE while with Aloe Creme Laboratories, Inc. and suggested its use as a trademark by defendant (R–2158–60, 2205, 2213, 2241).

31. Mr. White was a stockholder of defendant and interested in its operation far beyond that of an investor and was the founder of plaintiff (R–1292, 575, 603, 608, 2291). Mr. Goodman was formerly midwest sales manager for defendant and knew of its trademarks and sales (R–1297, 2109–16). The hiring of many of defendant's salespeople and demonstrators by plaintiff (R–2140, 1086) and the calling on the trade by plaintiff in the areas in which defendant had been successful (R–760, 942), and the use by plaintiff of defendant's famous Fort Lauderdale address (R–917), and selection and use of trademarks by plaintiff similar to defendant's trademarks disclosed an intention by plaintiff to trade on the reputation of defendant and cause confusion to plaintiff's benefit and the loss of defendant and the trade and purchasing public and reap where it had not sown.

32. Defendant originated in 1957 the practice of using an aloe vera plant and/or aloe vera leaf on the counter of the store where defendant's cosmetics and ointments were sold (R–1262–3), and has used the representation of a Design of Plant as a trademark to identify its products, so that these symbols have come to be associated exclusively with defendant and its products (R–1631). When plaintiff continued to use these same symbols in connection with the offering for sale and sale of its goods, such use was likely to fool prospective purchasers into buying such goods thinking they were the products of defendant (R–1262–3, 1628–31, 2023, 1151–2, 1162–3, 1332, 1409, 2147–50, 1654, 2067–9; Def.Ex. 6, 7, 64, 65, Group Ex. A, B, C and D).

33. People associate HOUSE OF ALOE with defendant on both the store level and the consumer level (R–27, 56, 1151, 1163, 1393–8, 1404–5). A drug store, Renneckar's advertised defendant's products stating "Rodney Stockton: He Keeps Women Beautiful, House of Alo Cosmetics will be demonstrated at Renneckar's". (Def.Ex. 103, R–1393–4). Consumers have addressed defendant as the House of Aloe (R–1404–5, Def.Ex. M, 66, 68, 110, 112; R–1400, 2077–82, 1390–9). Independents, such as the news media (Def.Ex. 102, Group Ex. I–24, J–16; R–1387–91), and the postal services

associate House of Aloe with defendant (Def.Ex. M–41, 66, 68; 107–113; R–1400).

34. Stores selling and advertising plaintiff's cosmetics bearing HOUSE OF ALOE and Design of Plant and other trademarks were confused and sent bills for advertising plaintiff's said goods to defendant for payment. This confusion occurred at: Loeb's Department Store of Lafayette, Indiana on two occasions as shown in Def.Ex. 87–90 (R–1369–71); H. Gordon & Sons of Gary, Indiana in Def.Ex. 91 and 92 (R–1372–3); Madigan's of Chicago, Illinois on two occasions in Def.Ex. 93–97 (R–1375–7); Marshall Field & Co. of Chicago, Illinois in Def. Ex. 95 and 96 (R–1277–9); Mercantile Stores, Inc. in Def.Ex. 100 (R–1384–5); Globe Store of Fox Lake, Illinois in Def. Ex. 99 (R–1384–5); and Josephine's Gifts of Mishawaka, Indiana in Def.Ex. 102 (R–1388–9).

35. The McAlpin's Store in Cincinnati, Ohio, placed an ALO- sign over the counter when it sold the ALO-COSMETICS of defendant to designate defendant's products and left it there when it replaced these products with those of plaintiff, but was removed upon defendant's complaint that it increased the likelihood of confusion (R–1647–89, 1422; Def.Ex. 136–138; Group Ex. O).

36. Franklin Pharmacy in Michigan City, Indiana, used defendant's display stand to display plaintiff's cosmetics until complaint caused this store to stop such use (R–1684–6).

37. There has been confusion over the telephone and in the mails between plaintiff and defendant (R–2075–88, 1396–1403; Def.Ex. 105, 106, 107, 108, 109, 111–3).

38. Plaintiff has admitted that its packages have been indistinctly marked, so that the trademarks on them could not be easily read in stores, thereby increasing the likelihood of confusion (R–1318–23, 908, 916).

39. Customers have been so confused that stores have discontinued selling plaintiff's cosmetics bearing HOUSE OF ALOE, ALOE ESSENCE and other marks similar to defendant's family of ALO- trademarks (R–1935–42, 1785–95, 2023–4, 2067).

40. As long as plaintiff continues to use HOUSE OF ALOE, ALOE ESSENCE, JEL D'ALOE, TROPICALOE and other trademarks similar to defendant's family of ALO- trademarks, there is and will continue to be likelihood of confusion to the loss and damage of defendant and the purchasing public (R–1554, 1111, 1087, 1093, 1099, 1644–8, 1100–9).

41. Plaintiff, by putting on its products such trademarks as ALOE ESSENCE, HOUSE OF ALOE, JEL D'-ALOE, TROPICALOE and the Design of Plant, has put an instrumentality in the hands of dealers and stores calculated to confuse customers into thinking they are buying the ALO- trademarked products of defendant and enable them to palm off plaintiff's goods as and for those of defendant, to plaintiff's gain and the loss of defendant and the purchasing public.

42. Plaintiff's aforesaid acts of adopting and using trademarks confusingly similar to the prior used and registered trademarks of defendant, and plaintiff's aforesaid acts of unfair competition were adapted to and did sustain the illusion that plaintiff was in some way connected with defendant, all to plaintiff's gain and to defendant's loss, injury and damage (R–2081–2, 1396, 1403, 1885, 2172, 2067, 2206, 2176–8).

43. Plaintiff has admitted that after Organon, Inc. acquired control of the stock of plaintiff (R–1815, 504), that it discontinued the use of HOUSE OF ALOE and now uses ROYAL HOUSE instead, and uses ROYAL in front of every trademark (R–474, 483–5, 493, 1965, 1907, 907, 1328, 2215, 1811, 912, 2386–9). This indicates an intention on the part of plaintiff to abandon HOUSE OF ALOE and the Design of Plant, so that plaintiff should not object to an order restraining it from again using

HOUSE OF ALOE and Design of Plant in the future.

44. Defendant sent plaintiff a letter to the attention of Mr. Goodman on January 5, 1965, in good faith, requesting that plaintiff stop the use of ALOE ESSENCE and other trademarks, so that the continued use of plaintiff's trademarks has been with knowledge of defendant's rights (Pl.Ex. 21; R–136; and Par. 9 of the complaint and attached to complaint as Exhibit B).

45. Plaintiff did not use HOUSE OF ALOE, ALOE ESSENCE, the Design of Plant, JEL D'ALOE, MASQUE OF ALOE and TROPICALOE in a descriptive sense, but as trademarks and by such use acquired no right to attack defendant's prior ALO- trademarks as a basis for using confusingly similar trademarks or filing the complaint in this case.

46. The letters sent by defendant to its customers and stockholders in good faith, including Def.Ex. 9 and 11, did not mention plaintiff (R–745), and were for the protection of defendant's trademarks and provided no basis for any injury or damage to plaintiff, and no basis for any allegations of unfair competition in the complaint.

47. The evidence discloses that defendant sent no letters to plaintiff or any of plaintiff's customers threatening any of them with a lawsuit, or did defendant ever file suit against any of plaintiff's customers (R–2294, 2234, 2319).

48. Infringement notices were sent out by defendant in good faith to third persons to protect defendant's rights to its trademarks, such notices did not injure or damage plaintiff and are immaterial and irrelevant to this case and furnish no basis for any claim of unfair competition in the complaint.

49. There is no evidence that defendant disparaged plaintiff or its products, or disrupted plaintiff's demonstrations by boisterous conduct or heckling at Ford's Pharmacy, Steven's, Willow Hill Pharmacy, or any other place and that plaintiff's claim of such unfair competition in the complaint has not been estab-lished by the evidence and is without basis (R–1625, 1043, 1717, 2045).

50. There is no substantial believable evidence of any acts of unfair competition on behalf of defendant, as alleged in the complaint, or otherwise in any way injured or damaged the plaintiff.

### The Relevant Market

51. Defendant is a relatively small company in the cosmetics industry, having sales in the year prior to trial, 1965, of $1,316,041.67. (PX 226; R. 1308).

52. Defendant was a pioneer in the development of the use of aloe vera and was virtually the sole user of aloe in the 1950's and early 1960's. (R. 147, 347–354, 1163–1165, 1144–1155, 1265).

53. By the sale of ointments in 1953 and cosmetics in 1957, defendant established itself as a leader in the stabilization of aloe vera gel for use in cosmetic products. (Ibid.)

54. A wide range of cosmetics is produced by both defendant and plaintiff corporations, including creams, cleansers, rouges, lipsticks, and other beautifying compounds. (DX's 9–45; R. 1189–1199, 1204, 1333–1334).

55. Although aloe vera is used as a distinguishing ingredient in the products of both defendant and plaintiff corporations, both corporations are but two competitors serving an infinitesimal fraction of the cosmetic market. (DX 133).

### No Showing of Monopolization

56. Although a book written by Lin Tso stated that defendant controlled 80 per cent of the aloe supply, Mr. Tso did not attribute this figure to Mr. Stockton of the defendant corporation. (R. 408–411, 417, 424–425, 1767–1768).

57. Mr. Tso testified that he did not know whether defendant had ever had a monopoly on aloe vera supply. (R. 426, 1771).

58. An article appearing in Coronet Magazine stating that Stockton controlled 80 per cent of the rare aloe vera

growers in this country was not based upon any direct statement of Mr. Stockton (R. 78).

59. The author of the Coronet article testified that, in his opinion, defendant did not have a monopoly over the aloe vera growers. (R. 1776, 1783).

60. Although Mr. Stockton posed for a Miami Herald article appearing February 5, 1967, which stated that he controlled 80 per cent of the aloe vera plant market, Mr. Stockton testified that he did not supply such a statement. (R. 176).

61. Mr. Stockton stated that he never reported to anyone that he had 80 or 85 per cent of the productive capacity of the aloe vera plants and further denied that his company had any monopoly. (R. 176–178). There is no evidence that defendant in fact controlled 80 to 85 per cent of the aloe vera market.

62. Plaintiff's witness, Mr. White, could not state that defendant controlled 80 or 85 per cent of the aloe vera market. (R. 2311).

63. Numerous of plaintiff's own officers testified that it had an adequate supply of aloe vera plants (R. 1930, 1977, 2179, 2296).

64. Plaintiff's founder, Mr. White, stated that plaintiff had a plentiful supply of aloe vera gel since October, 1964, when it began producing cosmetics. (R. 2296, 2312, 2331).

65. Mr. Hazelwood testified that he sold "two or three hundred gallons" of aloe vera gel to Mr. White prior to the October 15, 1964 date, which would have been extracted from some 5,100 pounds of aloe vera leaves. (R. 271–272, 2334).

66. Texas Aloe Corporation agreed to furnish plaintiff 75,000 pounds of aloe leaves per year. (R. 600, 2329).

67. Mr. Nacca of Organon, Inc., testified that his company would not have acquired plaintiff if it was not certain plaintiff had a plentiful supply of raw aloe vera material, and he satisfied himself that there was such a supply. (R. 1930, 1964).

68. Mrs. Helene Collins, who claimed to have been in business prior to defendant, had always found an adequate supply of aloe vera. (R. 351, 356–357).

69. Mrs. Mintons' pet products had always found an adequate supply of aloe vera (R. 367–406).

70. Carissa had always found an adequate supply of aloe vera. (R. 2332–2333).

71. Johnson Industries (with Vedra) had always found an adequate supply of aloe vera. (R. 1919–1920).

72. Shulton (with Desert Flower) had always found an adequate supply of aloe vera. (R. 1355).

73. There is no evidence in the record that defendant in fact has a monopoly over the supply of aloe vera.

*No Showing of Restraint of Trade*

A. Franchise Agreements

74. Defendant's drug store franchise agreements were entered into with 25 to 35 per cent of the drug stores with which it does business. (R. 121–122).

75. These agreements were sent to stores, but the stores were not required to sign them. (R. 120).

76. Under the terms of the franchise agreements (PX 18), the store is required to have at least three other franchise lines before the agreement will be offered. (R. 124–125, 1466).

77. The agreement by its own terms is cancelable by either party on 30 days' notice. (PX 18).

78. The fact that a store handled other products containing aloe vera had no effect on defendant's decision to grant or withdraw a franchise. (R. 124).

79. Approximately 60 of the stores under franchise also sold plaintiff's aloe vera products. (R. 1462, 1465, 1467).

80. The franchise agreement also contained a space for the owner to sign any bonus arrangements, and specifically provided a place for signature, marked "Proprietor or Manager." (PX 18).

81. There is no evidence that managers were receiving bonuses without

the knowledge or consent of their employers or owners.

### B. Growers' Supply Contracts

82. The aloe vera growers' supply contracts contain no restrictions forbidding growers from selling aloe vera leaves or plants, which defendant does not buy, to competitors of defendant, including plaintiff. (PX 232).

83. Plaintiff's executives, as well as other competitors of defendant, testified that they had adequate supplies of aloe plants and leaves. (R. 351, 405, 1930, 1977, 2179, 2296, 2332–2333, 2486–2487).

### C. Evidence of Disparagement

84. Aloe vera plants are extremely susceptible to contamination, and contamination was a matter of major concern to suppliers as well as to purchasers in the market. (R. 141, 529–545).

85. Although defendant once stated that plaintiff's gel was contaminated, plaintiff's supplier admitted that some of its products had been returned to it by its customers because they were in fact contaminated. (R. 226–227).

86. Although defendant complained to the Department of Agriculture that plants of a supplier of plaintiff had been afflicted by a mosaic wilt, this inquiry was prompted by concern on the part of aloe vera producers for the general status of the market and was not caused by malice. (R. 234).

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the trademark issues in the case under the Trademark Act of 1946.

2. Defendant's trademarks and registrations therefor, namely, ALO-FACE, Reg. No. 784,193, ALO-PLUS, Reg. No. 784,194, TRAV-ALO, Reg. No. 775,943, Design of Plant, Reg. No. 789,240 and 811,159, ALO-HANDS, Reg. No. 812,766, ALO-COSMETICS, Reg. No. 815,248, ALO-RELIEF, Reg. No. 825,909, ALO-OINTMENT, ALO-V SKIN CLEANSER, ALO-MOISTURE PLUS, ALO-ROUGE, ALO-LEGS, ALO-BODY, ALO-CABANA SET, ALO-LIPSTICK, ALO-POUDRE, ALO-V SHAMPOO, ALO-TONE, and ALO-BEAUTY MATTE, a family of ALO-trademarks and are valid, subsisting, uncancelled and unrevoked.

3. Defendant's trademarks and registrations therefor, namely, FASHION TAN, Reg. No. 659,620, AFTER TAN, Reg. No. 784,195 and MOISTURE PLUS, Reg. No. 794,900 are valid, subsisting, uncancelled and unrevoked.

4. Defendant's trademarks set forth in paragraph 2 of these conclusions of Law, hereinafter referred to as the ALO-family of trademarks, have acquired secondary meaning as indicating only the defendant as the source of origin of products on or in connection with which they are used. Defendant has acquired secondary meaning in this family of ALO-trademarks because of (1) long and continued use since defendant began the use of the first of said ALO- trademarks in 1953 and has continued to use said ALO-trademarks to this date, (2) defendant was the first and original user of an ALO- trademark on its ointments and cosmetics, and (3) the extensiveness of defendant's use, including sales of over eight millions of dollars in products bearing such ALO- trademarks and the expenditure of over two million dollars in advertising said trademarked products.

4. Plaintiff's trademark use of HOUSE OF ALOE, Design of Plant, ALOE ESSENCE, JEL D'ALOE MASQUE OF ALOE, TRAVEL MATE and TROPICALOE has been and is confusingly similar to and has infringed defendant's said family of ALO- trademarks and further such acts of infringement should be restrained.

5. Plaintiff's trademark use of TAN LIFE has been confusingly similar to and an infringement of defendant's FASHION TAN and AFTER TAN trademarks and further such acts of infringement should be restrained.

6. The unfair acts of Mr. Goodman and Mr. White with plaintiff, after leaving defendant under the circumstances, including the hiring of defend-

654

ant's personnel and approaching defendant's customers as though plaintiff were connected in some way with defendant and the using of defendant's aloe vera plant and leaves in sales were acts of unfair competition in aggravation of the aforesaid trademark infringement, and disclosed an intention deliberately, wilfully and wantonly to trade on defendant's reputation, so that plaintiff could reap where it had not sown.

7. Plaintiff's said trademark infringement provided it with no rights to attack defendant's family of ALO-trademarks or its registrations therefor. While plaintiff is free to make use of descriptive words in their usually descriptive sense, yet that gave plaintiff no right to use trademarks confusingly similar to defendant's trademarks in a trademark form and sense, in acts of infringement, so that Count I of the complaint is without basis and should be dismissed.

8. Since there is no evidence that defendant committed any acts of unfair competition with relation to plaintiff, Count II of the complaint is without basis and should be dismissed.

9. Since there is no evidence that defendant committed any acts of Restraint of Trade or Monopolization in violation of the anti-trust laws, including the Sherman Act and the Clayton Act, Counts III and IV of the complaint are without basis and should be dismissed.

10. Because plaintiff's acts of trademark infringement aggravated by unfair competition were intentional and deliberate, defendant is entitled to damages that it has suffered and treble damages for the wilfulness of plaintiff's acts and to profits that plaintiff has made by said acts, and this case is hereby referred to Francis L. Zimmermann to determine the amount of said damages and profits and report the same to this Court, the costs of said reference to be paid by plaintiff.

11. Because of the deliberateness of plaintiff's acts of trademark infringement and unfair competition, defendant is entitled to its costs herein as a part of the judgment herein.

12. The "relevant market" for establishing an attempted monopolization in violation of Sec. 2 of the Sherman Act (15 U.S.C. § 2) is "cosmetics" and the cosmetics industry.

13. Defendant has not attempted to monopolize interstate trade and commerce, and does not have a monopoly in the "relevant market" of cosmetics and thus has not violated Section 2 of the Sherman Act (15 U.S.C. § 2).

14. Even if the "relevant market" were considered to be the "aloe vera products" market, defendant has not attempted to monopolize interstate trade and commerce, and does not have a monopoly in that market and thus has not violated Section 2 of the Sherman Act (15 U.S.C. § 2).

15. Defendant's drug store franchise agreements are not "exclusive dealing" or "requirements" type contracts.

16. Even if defendant's drug store franchise agreements were considered to be "exclusive dealing" or "requirements" type contracts, they were not used unlawfully to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), nor were they used to monopolize interstate trade and commerce in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

17. Defendant's drug store franchise agreements do not violate the commercial bribery provision of the Robinson-Patman Act, Section 2(c) (15 U.S.C. § 13(c)), nor the price discrimination provisions thereof (15 U.S.C. § 13(a)).

18. Defendant's growers' supply contracts are necessary to insure that defendant has a continuing supply of aloe vera gel and were not used by defendant unlawfully to restrain interstate trade and commerce, and defendant thus did not violate Section 1 of the Sherman Act (15 U.S.C. § 1).

19. Defendant's growers' supply contracts were not used by defendant in an attempt to monopolize interstate trade and commerce, and defendant thus did not violate Section 2 of the Sherman Act (15 U.S.C. § 2).

20. Plaintiff has wholly failed to show that defendant combined or conspired with any of its aloe vera suppliers to destroy the business of defendant's competitors, or that defendant in any way restrained interstate trade and commerce in the production of aloe vera and the manufacture, sale and distribution of aloe vera products in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and has further failed to show that defendant in any way monopolized interstate trade and commerce in the production of aloe vera and the manufacture, sale, and distribution of aloe vera products in violation of Section 2 of the Sherman Act. (15 U.S.C. § 2).

## MEMORANDUM

This cause came on to be heard upon the plaintiff's complaint for a declaratory judgment on the validity of defendant's trademarks and the use of similar trademarks by the plaintiff, and upon plaintiff's allegations of unfair competition, antitrust violation and monopolization by the defendant, and upon defendant's counterclaim for trademark infringement and unfair competition on the part of the plaintiff. For convenience the parties are consistently referred to herein as plaintiff and defendant, rather than plaintiff and counter-defendant, or defendant and counter-plaintiff.

The Court heard and evaluated the testimony of witnesses and received documentary evidence. It heard the oral argument of counsel for the parties, has taken briefs, and now is fully advised in the premises.

Defendant, Aloe Creme Laboratories, Inc., a Florida corporation, in 1953, began the creation and sale of ointment and in 1957, cosmetics, and became a modern pioneer in the stabilization of aloe vera gel in these products.

Prior to the defendant's incorporation in 1953, the evidence shows that users cut leaves of the aloe vera plant and used the fresh gel from these leaves, but the gel being vegetable matter, decayed quickly and could not be stored for any length of time. There were sporadic attempts by others to maintain the fresh gel, but none of these stabilized the product for sufficient shelf life to establish a successful business. Defendant became the first in creating and selling stable products containing aloe vera gel that had a commercially acceptable shelf life.

In 1953, defendant was the first user of the trade name Aloe Creme Laboratories, Inc., which use has been continuous to date and has never been restrained.

Defendant's first product, an ointment, in 1953, was put out under the trademark ALO-CREME OINTMENT, abbreviated in 1963 to ALO-OINTMENT. Defendant's first cosmetics were introduced in 1957, under the trademarks ALO-CREME FACE, ALO-CREME HANDS, and ALO-CREME BODY, abbreviated in 1963 to ALO-FACE, ALO-HANDS and ALO-BODY. Defendant has also used on its products, since at least 1963, the trademarks ALO-PLUS, TRAV-ALO, ALO-RELIEF, ALO- and Design, ALO-MOISTURE PLUS, ALO-V SKIN CLEANSER, ALO-BEAUTY MATTE, ALO-TONE, ALO-ROUGE, ALO-LIPSTICK, ALO-POUDRE, ALO-V SHAMPOO, ALO-COSMETICS, ALO-CABANA SET, ALO-LEGS, Design of Plant, QUEEN NEFERTITI, FASHION TAN and AFTER TAN.

Plaintiff, American Aloe Corporation, in its complaint Paragraph 5, admits trademark use of ALO- by Aloe Creme Laboratories, Inc., by stating: "Defendant identifies its 'aloe products' by means of the word 'ALO' and combinations thereof."

Aloe Creme Laboratories, Inc., is the owner of the following trademarks and registrations therefor: ALO-FACE, Reg. No. 784,193, ALO-PLUS, Reg. No. 784,-194, TRAV-ALO, Reg. No. 775,943, De-

sign of Plant, Reg. No. 789,240 and 811,159, ALO-HANDS, Reg. No. 812,766, ALO-COSMETICS, Reg. No. 815,248, ALO-RELIEF, Reg. No. 825,909, ALO-OINTMENT, ALO-V SKIN CLEANSER, ALO-MOISTURE PLUS, ALO-ROUGE, ALO-LEGS, ALO-BODY, ALO-CABANA SET, ALO-LIPSTICK, ALO-POUDRE, ALO-V SHAMPOO, ALO-TONE, and ALO-BEAUTY MATTE, constituting a family of ALO- trademarks, and FASHION TAN, Reg. No. 659,620, AFTER TAN, Reg. No. 784,195 and MOISTURE PLUS, Reg. No. 794,900, and QUEEN NEFERTITI, Reg. No. 804,536.

Defendant has extensively sold and advertised cosmetics and ointments bearing said ALO- trademarks throughout the United States in leading department and drug stores from coast to coast with repeat orders to the extent of eight million dollars in sales and two million dollars in advertising.

After Aloe Creme Laboratories, Inc., was established on the market, Mr. White became a stockholder and familiarized himself with defendant's business and its products and trademarks. He then founded plaintiff, American Aloe Corporation. He hired Mr. Goodman, defendant's midwest sales manager, who engaged many of defendant's sales people and demonstrators to sell the same kind of products for plaintiff. Mr. Goodman then called on defendant's customers in the areas in which defendant had been successful. Mr. Goodman used aloe vera plants and leaves for plaintiff's demonstrations and sales, just as he had been taught to do by defendant. With full knowledge of defendant's trademarks, Mr. Goodman adopted for plaintiff, trademarks in both word and symbol form, so close to those of defendant that in the opinion of the Court, there would be likelihood of confusion.

Plaintiff adopted and began to use as trademarks, HOUSE OF ALOE, the Design of Plant, ALOE ESSENCE, JEL D'ALOE, TROPICALOE, TRAVEL MATE, TAN LIFE and others, so close to defendant's said family of ALO- trademarks, TRAV-ALO, FASHION TAN and AFTER TAN as to attract the attention of dealers and prospective purchasers, and so close in similarity to defendant's prior and established trademarks as to be likely to cause confusion and be calculated to confuse customers into thinking that they were buying the ALO- trademarked products of defendant.

At this stage, after receiving a proper infringement notice from defendant's attorney, plaintiff decided to file its complaint asking the Court to permit it to continue to use its trademarks and asking the Court to hold that those of defendant were invalid, and also alleging unfair competition, monopolization and antitrust violations. Because, at this point, plaintiff came into court with unclean hands due to its trademark infringement and unfair competition, the complaint should have been and will be dismissed. Due, however, to defendant's counterclaim, the Court retains jurisdiction to give complete justice and to determine defendant's rights on the issue of trademark infringement and unfair competition.

On the allegations in the complaint, claiming antitrust violation, monopolization and unfair competition, there is no evidence of any such violations by the defendant. There is no proof that defendant ever had a monopoly either in cosmetics or in aloe vera material. The record is replete with evidence that plaintiff and other competitors of defendant always have had an adequate supply of aloe vera material. Defendant's Drug Store Franchise Agreement and its Growers' Supply Contract include no restrictions violating the law. Any infringement notices sent to plaintiff or to others relating to the infringement of defendant's trademarks were proper as setting forth defendant's claim on its valid trademark rights and were sent in good faith. Such notices were not illegal. After considering all of the evidence in the case, the Court finds that the defend-

ant did not improperly disparage plaintiff or its products nor commit any acts of unfair competition alleged in the complaint. On allegations of violation of the Sherman Act or the Robinson-Patman Act, there is no evidence to support such allegations, and the complaint thereon should be dismissed.

The trademarks of Aloe Creme Laboratories, Inc., including ALO-FACE, ALO-PLUS, TRAV-ALO, Design of Plant, ALO-HANDS, ALO-COSMETICS, ALO-RELIEF, ALO-OINTMENT, ALO-V CLEANSER, ALO-MOISTURE PLUS, ALO-ROUGE, ALO-LEGS, ALO-BODY, ALO-CABANA SET, ALO-LIPSTICK, ALO-POUDRE, ALO-V SHAMPOO, ALO-TONE, and ALO-BEAUTY MATTE, constitute a family of ALO- trademarks.

The Court is of the opinion that each of the said ALO- trademarks of defendant has trademark significance capable of indicating a source of origin and is valid. The Court agrees with the United States Patent Office that registrations were properly granted by it to the defendant on said trademarks, and are good and valid in law. The Court further holds that the evidence has established that each of defendant's said ALO- trademarks has acquired secondary meaning as indicating only the products of Aloe Creme Laboratories, Inc. This is because of the original and exclusive adoption of these trademarks by defendant and the defendant's long and extensive use and advertising of these trademarks so that consumers, dealers, the news media, competitors and other independent parties have come to recognize cosmetics and ointments sold under said ALO- trademarks as indicating exclusively the products of defendant and that ALO- to them means only the products of Aloe Cream Laboratories, Inc.

Plaintiff's HOUSE OF ALOE, the Design of Plant, ALOE ESSENCE, JEL D'ALOE, MASQUE OF ALOE, TRAVEL MATE and TROPICALOE were used as trademarks and not as descriptive matter, and as trademarks were so similar to defendant's said trademarks as to be likely to cause confusion with defendant's said ALO- trademarks and also have actually caused confusion in stores and with consumers as shown by the evidence in the record.

Plaintiff's acts of trademark infringement and unfair competition have been made with knowledge of defendant's prior trademark rights and have been deliberate, wilful, and an effort to reap where it has not sown.

Further, such trademark infringement and unfair competition should be restrained, in the sustaining of the allegations in the counterclaim and the issue of an injunction restraining the plaintiff from further such acts.

Accordingly, this Court is of the opinion that the defendant Aloe Creme Laboratories, Inc., in this case, should prevail, and this Court has on this date simultaneously herewith adopted and entered its Findings of Fact and Conclusions of Law, as a part hereof, and at the same time has entered a Judgment accordingly.

### DECREE

This cause coming on to be heard on the pleadings, the evidence presented at the trial, the depositions and exhibits of the parties, and the briefs filed herein, and the Court being fully advised:

It is Hereby Ordered, Adjudged and Decreed:

1. That the plaintiff's complaint is hereby dismissed.

2. That the defendant's counterclaim is hereby sustained.

3. That American Aloe Corporation, and its agents, servants, employees, and attorneys, and all persons or corporations in active concert, participation or privity with it, be and are hereby forever enjoined and restrained from in any way, directorly or indirectly:

(a) infringing any of defendant's trademarks, including ALO-FACE, ALO-HANDS, ALO-BODY, ALO-LEGS, ALO-OINTMENT, ALO-RELIEF, ALO-TONE, ALO-PLUS, ALO-

LIPSTICK, ALO-COSMETICS, ALO-ROUGE, ALO-POUDRE, ALO-MOIS-TURE PLUS, ALO-BEAUTY MATTE, TRAV-ALO, Design of Plant, or any ALO- trademarks, FASHION TAN and AFTER TAN.

(b) using HOUSE OF ALOE, Design of Plant, ALOE ESSENCE, MASQUE OF ALOE, TRAVEL MATE, TROPICALOE, TAN LIFE or any other mark confusingly similar to defendant's aforementioned trademarks on or in connection with the selling, offering for sale, distributing or advertising cosmetics, or toilet preparations.

4. That this case be referred to FRANCIS L. ZIMMERMANN, as a Special Master in Chancery of the Court for an accounting and determination of the damages that defendant has suffered by reason of the said infringement and unfair competition committed by plaintiff and that said damages be trebled because of the wilfulness and deliberateness of plaintiff's said acts, and any profits that plaintiff has gained by said acts. Said Special Master in Chancery is hereby empowered to issue summons, and all other process and take all action necessary to conduct hearing in this cause. He is ordered and directed to take oral and documentary evidence and examine books and records of the plaintiff and to make a report of the actual damages suffered by the defendant.

Said Special Master in Chancery is ordered and directed to make such report and recommendations to this Court as he deems proper and to report his time spent, so this Court can determine a fair sum to award said Special Master for his fees and expenses. Said Special Master is authorized and directed to retain a Court Reporter and obtain a transcript of all hearings. The costs, expenses and fees, after approval by this Court, shall be taxed as costs against the plaintiff.

The Court retains jurisdiction for the sole purpose of enforcing this decree and ascertaining the damages done to defendant by the plaintiff and entering and enforcing judgment therefor.

This decree is final in all other respects, more particularly upon the issue of trademark, infringement, unfair competition and antitrust charges herein.